[Cite as *State v. Smith*, 2012-Ohio-5020.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 5-11-10

    v.

JAMILA SMITH,                          **O P I N I O N**

    DEFENDANT-APPELLANT.

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2009 CR 104**

**Judgment Reversed and Cause Remanded**

**Date of Decision: October 29, 2012**

APPEARANCES:

    *Stephanie N. Lape* **for Appellant**

    *Mark C. Miller and Alex K. Treece* **for Appellee**

Case No. 5-11-10

**WILLAMOWSKI, J**.

{¶1} Plaintiff-Appellant, Jamila Smith ("Smith"), appeals the judgment of the Hancock County Court of Common Pleas sentencing her to two years in prison after a jury found her guilty of aggravated possession of drugs. On appeal, Smith contends that many of her constitutional rights were violated because of numerous errors by the trial court, including denial of her motion to suppress, denial of her right to effective assistance of counsel, the consolidation of her trial with her co-defendant, and counsel's conflict of interest because of counsel's joint representation of both Brooks and Smith. She also claims that the jury's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, the judgment is reversed.

{¶2} On June 2, 2009, the Hancock County Grand Jury returned an indictment against Smith, charging her with aggravated possession of drugs (oxycodone pills)[1] in violation of R.C. 2925.11(A), in an amount equal to or exceeding five times the bulk amount, but less than fifty times the bulk amount, a felony of the second degree. The Grand Jury also returned a separate indictment against Smith's co-defendant, Mack Brooks ("Brooks"; Brooks and Smith together, "Defendants"), also for aggravated possession of drugs.

---

[1] The original indictment stated that the drugs were Oxycontin. However, the laboratory report indicated that they were oxycodone. Both drugs are Schedule II controlled substances, and the difference in the type of drug did not change the quantification that the drugs were five to fifty times bulk amount. The prosecution moved to have the indictment amended, and the defense did not have any objection. (Jan. 3, 2011 Hrg., p. 28)

-2-

{¶3} The charges arose after State Highway Patrol Trooper Kurt Beidelschies stopped Brooks for a marked lanes violation shortly before midnight on May 22, 2009. (Trial Tr. 253) Smith was Brooks' passenger, and the Defendants were unable to provide a valid copy of the rental agreement for the vehicle Brooks was driving, and they gave inconsistent stories about their travel plans. (Trial Tr. 256; 260-61) While waiting to obtain verification of Brooks' driver's license and a valid rental agreement, the trooper called for assistance from a canine unit. (Trial Tr. 261) Deputy Frederick Smith of the Hancock County Sheriff's Department, and his trained dog, "Becky," arrived at the scene. When Becky alerted on the vehicle, the trooper placed Brooks and Smith in investigative detention in the rear of his cruiser and conducted a search of the vehicle. (Trial Tr. 262-64) A second trooper, Matthew Geer, arrived to assist. (Trial Tr. 464)

{¶4} During the search, the officers found marijuana, pictures of Brooks holding large sums of money, an empty prescription pill bottle for Oxycontin, money ledgers and seven cell phones. (Trial Tr. 266) The search by the side of the interstate lasted approximately thirty minutes after which time the vehicle was driven to the Ohio State Highway Patrol Findlay Post, approximately seven miles from the stop point, to continue the search. (Trial Tr. 273-74) Once back at the station, all three officers continued to search the vehicle. Within the first 5-10 minutes, Trooper Geer noticed that the "B-Pillar" on the driver's side of the

vehicle was loose, and they discovered a large quantity of pills hidden inside.[2] (Trial Tr. 275-76)

**{¶5}** After discovering the pills, Trooper Beidelschies asked if either of the Defendants would like to talk with him. Smith indicated that she would be willing to talk, so Trooper Beidelschies informed Smith of her Miranda rights and began to question her. Smith confessed to the trooper that they were driving to West Virginia to "drop-off [the pills that were found in the door] and pick up money," and that Brooks had agreed to pay her $500 to accompany him. (Trial Tr. 295; 301-2, Exhibit 6) Smith's statement indicated that she didn't know exactly where they were going or how much money they were going to receive for the pills. (Ex. 6). She didn't know where the pills came from, "I was just along for the ride and to help drive." (*Id.*) She admitted that this was the second time she had made this trip down to West Virginia with Brooks. Smith signed the confession form, handwritten in part by the trooper, acknowledging their involvement in transporting the pills. (Trial Tr. 302, Ex. 6)

**{¶6}** Gene Murray, an Ohio attorney, was retained by the Defendants and entered his appearance for both Smith and Brooks on June 10, 2009. Smith and Brooks entered pleas of "not guilty" and were released on bond. In July 2009, Mr. Murray filed a Motion to Suppress, citing multiple grounds. After several

---

[2] The "B-pillar" is the vertical support post on the driver's side between the floor and the roof, separating the front and rear passenger compartments.

continuances, suppression hearings were held in September 2009 and March 2010. The trial court denied the motion to suppress on June 21, 2010.

{¶7} On September 13, 2010, Mary Hickey, an attorney licensed in Michigan, filed a motion to appear pro hac vice as counsel for both Defendants. Her motion represented that Mr. Murray would remain as local counsel to assist and advise her with respect to Ohio practice and procedure. On September 28, 2009, Mr. Murray filed a motion to withdraw as counsel indicating that Smith and Brooks had "employed newly retained counsel, Mary S. Hickey, esq., as * * * defense attorney, to replace the undersigned movant counsel Murray." The trial court granted Mr. Murray's motion the same day. The following day, the trial court granted Ms. Hickey's motion to appear pro hac vice.

{¶8} During an October 8, 2010 status conference, the trial court ordered the scheduling of separate trial dates for each defendant to avoid constitutional violations under *Bruton v. United States*, 391 U.S. 123 (1968).[3] (10/8/10 Hrg. Tr. 40-42). However, for reasons not evident in the record, both cases were combined and consolidated for trial on January 3, 2011. As they were waiting for the jurors to arrive for orientation on the day scheduled for trial, the trial court and attorneys discussed some preliminary matters on the record.

---

[3] In *Bruton*, the United States Supreme Court held that a co-defendant's statement implicating a defendant cannot be used in a joint trial unless the co-defendant is available for cross-examination. *Bruton*, 391 U.S. at 127-128.

{¶9} First, the trial court questioned Ms. Hickey concerning her decision, and her clients' decision, to allow Ms. Hickey to jointly represent them. (1/3/11 Hrg. Tr. 4) Ms. Hickey stated that she had found a waiver of potential conflicts signed by both Defendants in the file she "inherited" from Mr. Murray, and that she had talked with both Defendants about the conflict and informed them it was a waiveable matter. And, the retainer agreement they both signed with her had stated that they both had the right to separate counsel and that their interests would be better served if they were represented by separate counsel. (*Id.* at 5) Ms. Hickey also stated that she "briefly" met separately with Smith to make sure that she wanted to go forward with her as their joint attorney, "particularly in light of the State's offer to allow [Smith] to plead to a reduced charge if she would testify against Mr. Brooks." (*Id.*) Ms. Hickey stated that she was satisfied that the waivers were knowing and voluntary. (*Id.*)

{¶10} The trial court also addressed the potential problem of having a joint trial and whether the admission of Smith's statement would violate any constitutional rights under *Bruton* and *Crawford v. Washington*, 541 U.S. 36 (2004).[4] Ms. Hickey indicated that her clients would be willing to waive any *Bruton* issues and the prosecution prepared a waiver for the Defendants to sign.

---

[4] In *Crawford*, the United States Supreme Court held that a defendant's federal confrontational constitutional rights are violated by the admission of "testimonial" statements of witnesses absent from trial unless the witness is unavailable to testify and when the defendant had a prior opportunity to cross-examine the witness.

-6-

(1/3/11 Hrg. Tr. 5-6) The trial court then granted Ms. Hickey's request for a continuance, due to the prosecution's failure to timely provide requested discovery materials that Ms. Hickey claimed she needed for trial.

{¶11} The joint trial was finally held on February 7, 8, and 9, 2011, nearly two years after the initial traffic stop. Trooper Beidelschies, Trooper Geer, and Deputy Smith testified as witnesses for the State, describing what occurred when Trooper Beidelschies made the initial traffic stop, when Deputy Smith arrived and Becky alerted on the vehicle, and how they conducted the initial search of the vehicle beside the interstate. After finding the marijuana, photos of Brooks with quantities of money, the ledgers, an empty pill container, a plastic baggie, and multiple cell phones, the officers testified that the finding of these "criminal indicators" led them to believe that there might be a significant amount of drugs in the vehicle. (Trial Tr. 476) It was then decided to move the vehicle back to the station for purposes of the officers' safety and so that they could conduct the search with better lighting and the availability of tools to facilitate searching the vehicle, especially given that they had found evidence of tampering with the seat bolts, which could indicate the presence of a hidden compartment. (*Id.* at 457, 463) All three of the officers were present when Trooper Geer found several bags containing over one-thousand pills hidden in the B-Pillar. (*Id.* at 492) The officers recognized the pills to be narcotics because of their markings, and divided

the tablets between the three of them for counting, in order to facilitate the counting process. (*Id.* at 342-46) The testimony from all three of the officers as to what occurred was consistent with each of the other's testimony.

{¶12} The video record of the traffic stop and initial search from Trooper Beidelschies' vehicle's video camera was also played for the jury. (State's Exhibit 7) However, this video recording was incomplete and ended before the search was concluded. Trooper Beidelschies testified that he did not realize that the video card was almost full when he began his shift that evening and that it had stopped recording because it had run out of memory space. (Trial Tr. 431-35) They did not record the search of the vehicle back at the Highway Patrol Post because it was not typical to do so, there was no recording equipment in the area where they conducted the search, and there was no reason to record the search because there were three officers present to witness what was occurring. (*Id.* at 492) Trooper Geer testified that the Defendants also witnessed the search. (3/25/10 Suppression Hrg. Tr. 25)

{¶13} Heather Sheskey, a forensic chemist and experienced criminologist with the Ohio State Highway Patrol Crime Laboratory, testified as to the process of analyzing the drugs, the chain of custody, the quantity of pills that she tested, and the fact that the pills were various strengths of Oxycontin, which was a

proprietary name for these pills, which contained the drug oxycodone. (Trial Tr. 384-409.)

{¶14} The Defendants' attorney cross-examined the State's witnesses extensively and tried to discredit their testimony by suggesting that the records of the chain of custody were insufficient; that there were discrepancies in the amount of pills alleged found; that the officers had failed to follow departmental procedures regarding making video and audio recordings of the events that transpired that night; that there was something improper in the fact that Trooper Beidelschies had written most of Smith's confession; that there were no witnesses to Smith's statement; and, that it was improper to detain the Defendants for as long as they did and then to drive the vehicle back to the post to continue to the search. Ms. Hickey suggested that "evidence has been, if not manufactured, that it was actively misrepresented in the official record." (Trial Tr. 776-777, Defendants' Closing Argument)

{¶15} The defense also offered the testimony of a video forensic expert witness, Edward Primeau, who testified that it was his opinion that there were three possible reasons why the video terminated before the end of the search: the equipment malfunctioned, the storage device was full, or it was turned off or tampered with. (Trial Tr. 708-12) He believed this video had been turned off. (*Id.*) However, on cross examination, he acknowledged that he could not state

how much recording time may have been left on the memory at the time the recording commenced. (*Id.* at 714)

{¶16} After considering all of the testimony and the exhibits that were admitted, the jury found both Smith and Brooks guilty of aggravated possession of drugs, a felony of the second degree. The matter was set for sentencing.

{¶17} At the March 2, 2011, sentencing hearing, Smith and Brooks appeared with new defense counsel and indicated that they no longer wished to have Ms. Hickey represent them. Ms. Hickey was then discharged as defense counsel, and Stephanie Lape and Adam Bleile commenced representation of the Defendants.

{¶18} The new defense counsel had filed a motion for a mistrial pursuant to Crim.R. 33(A)(1), claiming that the Defendants were denied a fair trial due to an irregularity in the proceedings, namely the fact that they were represented by Ms. Hickey, who they claim was not properly admitted pro hoc vice to practice law in the State of Ohio. (3/2/11 Sentencing Tr. 52) After considering the arguments of the parties, the trial court found that there was no evidence that the Defendants did not receive a fair trial and denied the motion for a new trial. (*Id.* at 55; Mar. 22, 2011 Decision)

{¶19} The trial court then proceeded to separately sentence the Defendants. The trial court sentenced Smith to the minimum sentence, a mandatory prison

sentence of two years. (May 12, 2012 Nunc Pro Tunc J.E.). The trial court stated that, based upon the evidence in the record, it believed that Smith's role was considerably less significant than Brooks' role.[5] (Sent. Tr. 82)

**{¶20}** It is from this judgment that Smith now appeals, raising the following eight assignments of error for our review.

### First Assignment of Error

**The trial court failed to grant a motion to suppress evidence, namely oxycodone pills, which was obtained by an unreasonable search and seizure in violation of [Smith's] Fourth Amendment rights.**

### Second Assignment of Error

**[Smith's] Sixth Amendment right to competent counsel was violated when [Smith's] first trial attorney, Ohio counsel, failed to raise all necessary issues in a boiler plate Motion to Suppress and then attempted to raise these issues at the Suppression hearing.**

### Third Assignment of Error

**[Smith's] Sixth Amendment right to competent counsel was violated when [Smith's] second trial attorney, Michigan counsel, failed to associate with Ohio counsel, failed to file a Motion to Suppress after given permission by the court to file such a motion, failed to file a Motion to Suppress [Smith's] alleged statement and created a serious conflict of interest by representing both defendants in a joint trial.**

---

[5] The trial court sentenced Brooks to a mandatory seven-year prison term. (Mar. 24, 2011 J.E.)

**Fourth Assignment of Error**

**[Smith's] conviction is not supported by sufficient evidence to satisfy Due Process under the Fifth Amendment and [Smith's] conviction is against the manifest weight of the evidence.**

**Fifth Assignment of Error**

**The trial court erred in admitting as evidence opinion testimony of the troopers and "criminal indicators" as this evidence was prejudicial to [Smith] in violation of [Smith's] Fifth and Sixth Amendment rights to a fair trial.**

**Sixth Assignment of Error**

**[Smith's] Fourth Amendment rights were violated by the unreasonable investigative detention and further transport of [Smith] to the trooper post.**

**Seventh Assignment of Error**

**[Smith's] Sixth Amendment right to confront witnesses was violated when the Trooper was allowed to testify as to inconsistent statements made by the Co-Defendant.**

**Eighth Assignment of Error**

**The trial court allowed [Smith's]first trial attorney to withdraw without [Smith] present at a hearing on such and without any notice to [Smith] in violation of [Smith's] right to Due Process, to be represented by competent Ohio counsel, and to be present at all critical stages of the prosecution in violation of the Fifth, Sixth, and Fourteenth Amendments.**

{¶21} We shall begin our review with Smith's third assignment of error, as that is dispositive of this case. In her third assignment of error, Smith asserts that her right to effective assistance of counsel was violated because there was an

actual conflict of interest created by the joint representation of Smith and Brooks by the same attorney. She also contends that the trial court failed to make proper inquiries into this conflict.

{¶22} Smith argues that an actual conflict existed because the interests of the two Defendants and their level of culpability were very different. Smith maintains she was only a passenger and there was no evidence showing that she had anything to do with the oxycontin found in the vehicle. Most importantly, the interests of the two Defendants were definitely opposed when Smith was offered a plea agreement if she would testify against Brooks. Smith also complains that the trial court failed to adequately inform her that the court would appoint them separate counsel and that she had the right to change her mind about the joint representation.

{¶23} The Sixth Amendment right to the effective assistance of counsel secures to a criminal defendant both the right to competent representation and the right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Glasser v. United States*, 315 U.S. 60, 70 (1942). Courts also have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

{¶24} A possibility of a conflict exists if the "interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties." *State v. Dillon*, 74 Ohio St.3d 166, 1995-Ohio-169, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356 (1980), fn. 3. An actual conflict of interest exists if, "'during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.'" *Id*. at 169, quoting *Cuyler*. *Accord, State v. Gillard*, 78 Ohio St.3d 548, 552, 1997-Ohio-183. The Ohio Supreme Court has held that "a lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *State v. Manross*, 40 Ohio St.3d 180, 182 (1988); *Gillard*.

{¶25} An "actual conflict of interest," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, (2002), fn. 5; *State v. Gillard*, 78 Ohio St.3d at 552. Thus, to prove an "actual conflict of interest," the defendant must show that his counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his representation." *Id.*, quoting *Cuyler v. Sullivan*, 446 U.S. at 349–350. In order to show such a conflict, a defendant must "'point to specific instances in the record to suggest an actual conflict or impairment of [his] interests.'" *United States v. Hall*, 200 F.3d 962,

965–66 (6th Cir.2000), quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.1987) (internal quotation omitted)); accord *Riggs v. United States*, 209 F.3d 828, 831–32 (6th Cir.2000). An "adverse effect" is established where the defendant points to "some plausible alternative defense strategy or tactic [that] could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir.2000) (internal quotation omitted).

{¶26} Requiring or permitting a single attorney to represent co-defendants "is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482-483 (1978). *Accord Wheat*, 486 U.S. at 159-160. "The mere representation by one lawyer of two defendants charged with the same offenses does not of itself constitute a conflict of interest; whether a conflict exists must be determined by the facts of each case." *Columbus Bar Assn. v. Ross*, 107 Ohio St.3d 354, 359, 2006-Ohio-5, ¶ 26. And, of course, the right to be represented by an attorney free of conflicts must be balanced against "the right of a defendant who does not require appointed counsel to choose who will represent him." *See U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).

{¶27} Plea bargaining is a "critical stage" of criminal proceedings, and the right to effective assistance of counsel applies at the plea bargaining stage. *Missouri v. Frye*, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379 (2012). The Sixth

Amendment's guarantee of effective assistance of counsel encompasses the attorney's obligation to avoid conflicts of interest arising from joint representation during the plea stage of the proceedings. *See Holloway*, 435 U.S. at 490 ("[I]n this case [a conflict of interest] may well have precluded defense counsel * * * from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable."). An attorney provides ineffective assistance where joint representation compels the attorney to forgo plea negotiations on one client's behalf. *See United States v. Hall*, 200 F.3d 962, 966 (6th Cir.2000) ("Foregoing plea negotiations is proof of an actual conflict of interest.") (Citation omitted). A conflict of interest occurs where defense counsel is "prevented from effectively engaging in any separate plea negotiations on one party's behalf without detrimentally affecting co-defendants." *See, e.g., Moss v. U.S.*, 323 F.3d 445, 464 (6th Cir.2003).

{¶28} At the March 25, 2010 suppression hearing, when Smith was still represented by Mr. Murray, the trial court inquired as to whether there had been any discussion of resolution of the cases.

> [The Prosecutor]: There has, your Honor. I've made two offers to the Defendants.[6] First to Jamila Smith, I did offer through her

---

[6] The "offer" made to Brooks would not have provided him with much, if any, of a benefit. The prosecutor stated that the only negotiations they had with him was that the State would remain silent if he pled guilty to the charge as it was set forth in the indictment. There was not a significant advantage to Brooks in

-16-

attorney a reduced charge to a felony of the fourth degree, possession of drugs. And I would stand with her on a request for community control sanctions or probation on that matter if she pled guilty and provided truthful testimony.

She did provide an admission, a written admission and an oral admission to the possession of these drugs to the arresting officer. So we would ask that she would continue with those statements that she gave the police if she was called to give testimony.

(3/25/10 Hrg. Tr. 9)

{¶29} Smith was offered a plea bargain if she would agree to testify against Brooks. At this point, it would seem obvious that the interests of Smith and Brooks have diverged to the point where it would not be possible for the same attorney to represent both Defendants' conflicting interests. It would appear to have been in Smith's best interest to seriously consider a plea offer in which she would have only been charged with a fourth degree felony, and the state would have recommended community control or probation. Instead, she was sentenced to a mandatory prison sentence of two years for a second degree felony. Conversely, it was definitely in Brooks' best interest that Smith decline to accept the plea agreement so that she would not testify against him.

{¶30} Under these circumstances, we do not see how one attorney could legitimately claim to give effective and impartial advice to serve both Defendants. It may have been different if Smith declined to accept the plea agreement because

---

pleading guilty, so we did not find that a conflict existed in that case. *See State v. Brooks*, 3d Dist. No. 5-11-11, 2012-Ohio- ---.

she professed her innocence, or if she was reluctant to testify against Brooks because of some sense of loyalty or fear of reprisal. However, *Smith had already signed a confession admitting her guilt and implicating Brooks.*

**{¶31}** If Smith's counsel would have successfully pursued this plea offer on Smith's behalf, the result would have detrimentally affected Brooks. *See Moss, supra.* As such, the existence and the terms of this plea offer establish that Smith's counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his representation." See *State v. Gillard*, 78 Ohio St.3d at 552. Based on the facts in this case, Smith's constitutional rights to effective and conflict-free representation of counsel were denied her at the plea bargaining stage.

**{¶32}** This Court has also recognized the trial court's duty to conduct an inquiry into a possible conflict of interest to determine whether a defendant would receive the right to conflict free counsel guaranteed him by the Sixth Amendment to the United States Constitution. *State v. Johnson*, 185 Ohio App.3d 654, 2010-Ohio-315 ¶¶ 3-4 (3d.Dist), citing to *Gillard*. In *Johnson*, a review of several seminal United States Supreme Court cases clearly demonstrated that where a trial court knows or reasonably should know of an attorney's possible conflict of interest in the representation of a person charged with a crime, the trial court has an affirmative duty to inquire whether a conflict of interest actually exists.

*Johnson*, at ¶ 3, quoting *Gillard*, 64 Ohio St.3d at 309–312. When "a trial court breaches its affirmative duty to inquire, a criminal defendant's rights to counsel and to a fair trial are impermissibly imperiled and prejudice or 'adverse effect' will be presumed." *Id.*

{¶33} In the case before us, Smith and Brooks chose to be represented by the same attorney two times -- first, when they retained Mr. Murray, and then again, when they replaced him with Ms. Hickey. On January 3, 2011, on the day scheduled for trial, the trial court inquired about the joint representation *for the first time* on the record.

> The Court: Ms. Hickey, the first question that I have regards your decision and your client's decision, as I understand, to allow you to jointly represent them. Would you like to expound on that, if you would?

(1/3/11 Hrg. Tr. 4)

{¶34} Ms. Hickey responded that the Defendants had signed waivers of any conflict for Mr. Murray, that her retainer agreement had stated that they both had the right to separate counsel, and that she had explained to the Defendants about the dangers of dual representation. (1/3/11 Hrg. Tr. 5) Ms. Hickey assured the trial court that the Defendants' waiver of any conflict and their decision to have a joint trial with joint representation was made knowingly and voluntarily. (*See id.* 4-6) The trial court explained to counsel and the Defendants how this dual representation and joint trial would limit the type of defense available. However,

-19-

Ms. Hickey assured the trial court that they were aware of this, and that the joint representation would not be detrimental to their chosen trial strategy.

{¶35} The trial court then discussed the *Bruton* issues involved in a joint trial, and made a brief and perfunctory inquiry of Smith as to whether she wanted to proceed that day in a joint fashion. (*Id.* at 8) Even if we were to assume that this was a sufficient waiver and acknowledgement of her rights to conflict-free representation *for the purposes of the trial*, where the Defendants had represented that their defense strategy did not require antagonistic defenses, we find that Smith had not participated in any warning or inquiry concerning the dangers of the joint representation pursuant to her representation by Mr. Murray and at the time of the plea bargain. We question how the trial court could adequately address this issue when it waited until the *day of trial* before inquiring as to whether Smith was aware of the dangers of the dual representation, when the Defendants had been jointly represented for more than a year and a half, including during the critical stage of plea negotiations. *See Frye*, *supra*. Furthermore, although Ms. Hickey had represented that *she* had discussed the matter with them and believed that their decision to go forward with one attorney was knowingly and voluntarily made, there is no real evidence in the record that Mr. Murray had thoroughly informed Smith of her rights to separate counsel, her right to have counsel appointed if she could not afford to hire her own separate counsel, and the dangers of dual

representation, especially given the divergent interests of Smith and Brooks relative to the plea negotiations.[7]

{¶36} We recognize that a trial court has "wide latitude" in determining whether an actual or potential conflict exists in balancing the right to counsel of choice against the needs of fairness. *State v. Keenan*, 81 Ohio St.3d 133, 137, 1998-Ohio-459; *Gonzalez-Lopez*, 548 U.S. at 152. However, as the United States Supreme Court noted in *Wheat*, "multiple representation of criminal defendants engenders special dangers of which a court must be aware." *Wheat v. U.S.*, 486 U.S. at 160. These circumstances require a thorough inquiry concerning the joint representation at an early stage in the process. In this case, the plea offer made to Smith created an actual conflict of interest which was detrimental to Smith's interests.

{¶37} Therefore, finding that Smith was denied her Sixth Amendment right to effective and conflict-free counsel, we sustain her third assignment of error. Because this finding requires us to vacate and reverse the judgment of the trial court, it is not necessary to address the other assignments of error.

---

[7] Ms. Hickey stated that there was a waiver form in the file that she "inherited" from Mr. Murray, but that waiver form was not presented to the trial court, it was not in the record, there was no discussion as to what it had said and whether it would have constituted an effective waiver, nor was there any information concerning whether Mr. Murray had even discussed the matter with the Defendants, or whether they had unknowingly signed a standard representation form containing standardized boilerplate language.

**{¶38}** Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for further action consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**SHAW, P.J. and ROGERS, J., concur.**

**/jlr**