[Cite as *State v. Allen*, 2022-Ohio-4360.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BRIAN S. ALLEN,

Defendant-Appellant.

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 CO 0002**

Criminal Appeal from the
East Liverpool Municipal Court
Columbiana County, Ohio
Case No. 21 CRB 323

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

**JUDGMENT:**
Affirmed.

*Atty. Vito Abruzzino*, Prosecutor*, Atty. Christopher R. W. Weeda,* Assistant Prosecutor, *Atty. Steven V. Yacovone,* Assistant Prosecutor, 135 South Market Street, Lisbon, Ohio 44432 for Plaintiff-Appellee and

*Atty. Charles A.J. Strader,* Atty. Charles Strader, LLC, 175 Franklin Street, SE*,* Warren, Ohio 44481 for Defendant-Appellant.

Dated: December 1, 2022

---

**Robb, J.**

{¶1} Appellant, Brian S. Allen, appeals the trial court's judgment finding him guilty of assault in violation of R.C. 2903.13(A), a first-degree misdemeanor, after a jury trial. Appellant was sentenced to 90 days in jail with 80 days suspended and one year of probation; ordered to pay a $250 fine and court costs; ordered to have no contact with the victim, the victim's family, or the state's witnesses; and ordered to attend an anger management course. We stayed his jail term pending appeal.

{¶2} Appellant Brian raises four assignments of error and contends his rights to a speedy trial and conflict-free counsel were violated. He also asserts his conviction is against the manifest weight of the evidence and based on insufficient evidence. For the following reasons, we affirm.

### Statement of the Case

{¶3} An argument arose about personal property the day after Dale Allen's funeral. According to the trial testimony, the decedent's mother, Linda Allen, told people attending the calling hours that she did not want her grandson, Dillon Allen, to have his father's possessions, which were displayed at the funeral home, because Dillon would pawn them. This argument eventually resulted in a physical altercation between Dillon, and the decedent's three brothers, Daniel, Appellant Brian, and David Allen. Daniel, Brian, and David Allen shared the same trial counsel, and their cases were consolidated for trial purposes only.

{¶4} The day of the altercation, Dillon called his grandmother yelling and upset about her derogatory statements. Dillon decided to return one of the items, a deer head, to her but wanted to keep the other disputed item, a crossbow. At one point during the call, Dillon was told to come and collect his father's possessions from his grandmother's home. Dillon's uncle Brian was there at the time. According to Dillon, Appellant Brian told him over the phone that he was going to "beat his ass." (Tr. 233.) But according

to Brian, Linda, and Dillon's grandfather Daniel Allen Jr., Dillon told Brian he was going there to "smack [Brian] in [his] fat fucking head." (Tr. 571.)

{¶5} Linda put Dillon's father's possessions in garbage bags and placed them in the driveway. Dillon asked his mother, Rhonda Allen, to go with him to collect his father's things, and she asked her boyfriend to go too because he had a truck. They drove separately to Linda and Daniel Jr.'s house. Dillon drove his mother's car and had his cousin Ryan with him, and Rhonda arrived with her boyfriend, William Buckins, referred to as Bud. Rhonda and Bud began loading the bags into his truck while Dillon delivered the deer head. (Tr. 203.)

{¶6} Dillon's other uncle, Daniel, was sitting in his parked truck and was on the telephone. Meanwhile Linda called Dillon's third uncle, David Allen, to come to the home to help maintain the peace. (Tr. 541.)

{¶7} The testimony thereafter is conflicting. Appellant Brian testified that Dillon "sucker-punched" him; whereas Dillon testified that Brian attacked him and pushed him onto the hood of a car. Dillon is five feet, nine inches tall and 140 pounds, and his uncle Brian is six feet, five inches tall and weighs 375 pounds. (Tr. 634.) Dillon recalls being thrown around "like a rag doll." He said the fight was about him disrespecting his grandmother. (Tr. 204.)

{¶8} There is limited video evidence of the physical altercation that was captured via a doorbell camera. It does not depict the entire altercation. It is difficult to see details of the fight because the majority of the footage depicts the front porch, and the altercation occurred on the far side of the street farthest away from the camera.

{¶9} The video shows Dillon surrounded by his three uncles, as well as his cousin Ryan, his mother Rhonda, and Bud. Dillon is seen leaning backward on the hood of a car and being grabbed and pulled. At one point, Dillon falls toward the ground and nearly lands on the street before Appellant Brian can be seen picking him up and placing him back toward the center of the hood of the car. Daniel is the farthest away from the camera, and he can be seen leaning toward Dillon and grabbing at him. Dillon then slips away with Ryan's help. Daniel and Appellant Brian then pursue him down the street while Rhonda can be seen trying to hold them back. (State's Exhibit 6; Defendant's Exhibit D.)

{¶10} The footage ends, and thereafter, Dillon picked up a paver from a neighbor's landscaping before dropping it. (Tr. 674.) As a result of the altercation, Dillon had scrapes on his knees, elbows, and nose. Photographs of his injuries were admitted at trial. (Tr. 212; State's Exhibits 1-4.)

{¶11} Appellant Brian was initially charged with domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor. (March 18, 2021 Arraignment Entry.) Appellant Brian appeared with counsel, plead not guilty, and signed a waiver of speedy trial time. (March 18, 2021 Time Waiver.)

{¶12} Following the exchange of discovery, the jury trial was set for August 4, 2021. The parties appeared with counsel, but the trial did not go forward in light of a potential plea deal. The plea agreement was not finalized, and the trial was reset for October 27, 2021. There is no transcript of this hearing in the record. (August 4, 2021 Judgment Entry.)

{¶13} On that same date, August 4, 2021, the trial court granted the state's motion to amend the charge from domestic violence to assault, in violation of R.C. 2903.13(A), a first-degree misdemeanor. (August 4, 2021 Judgment Entry.) Appellant Brian did not challenge the amended charge.

{¶14} On October 25, 2021, Appellant Brian filed a motion to continue the October 27, 2021 jury trial, which the court granted. It reset the trial to January 5, 2022. The jury trial commenced January 5, 2022, and the jury found Appellant Brian guilty of assault. (Jan. 7, 2022 Verdict.) Appellant's brother Daniel was also convicted of assault via the same jury trial. Their other brother, David W. Allen, was found not guilty. (Tr. 819.) Their cases were consolidated for trial purposes only. Appellant's brother, Daniel Allen, separately appealed to this court.

{¶15} As stated, Appellant Brian was sentenced to 90 days in jail with 80 days suspended and one year probation. He was ordered to pay a $250 fine and court costs; ordered to have no contact with the victim, the victim's family, or the state's witnesses; and ordered to attend an anger management course. (Jan. 7, 2022 Sentence and Conviction.) Appellant Brian raises four assignments of error.

<u>First Assignment of Error: Right to a Speedy Trial</u>

{¶16} Appellant Brian's first assigned error asserts:

"The trial court committed reversible error by failing to bring the case of Assault against the Defendant/Appellant, Brian S. Allen, to trial pursuant to the speedy trial statute of the Ohio Revised Code."

{¶17} An appellate court's review of a speedy trial claim is a mixed question of law and fact. *State v. High*, 143 Ohio App.3d 232, 242, 757 N.E.2d 1176 (2001). We defer to the trial court's findings of fact if they are supported by competent, credible evidence and independently review whether the trial court correctly applied the law. *Id.*

{¶18} Ohio recognizes both a constitutional and a statutory right to a speedy trial. *State v. King*, 70 Ohio St.3d 158, 161, 637 N.E.2d 903 (1994). The prosecution and the trial court are required to try an accused within the time frame provided by statute. *State v. Singer*, 50 Ohio St.2d 103, 105, 362 N.E.2d 1216 (1977).

{¶19} R.C. 2945.73(B) states: "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." Thus, a defendant is statutorily required to raise the issue by motion made at or prior to the commencement of trial. *Id.*

{¶20} R.C. 2945.71 provides the timeframe for a defendant's right to a speedy trial based on the level of offense and states in part:

(B) Subject to division (D) of this section, a person against whom a charge
of misdemeanor * * * is pending in a court of record, shall be brought to trial
as follows:

* * *

(2) Within ninety days after the person's arrest or the service of summons,
if the offense charged is a misdemeanor of the first or second degree, or
other misdemeanor for which the maximum penalty is imprisonment for
more than sixty days.

R.C. 2945.71(B). And R.C. 2945.72 lists a number of tolling events that extend the period of time in which the state must bring a defendant to trial. R.C. 2945.71(A)-(I).

{¶21} This court has repeatedly held that a defendant's failure to file a motion to dismiss on speedy trial grounds waives the issue on appeal. *State v. Trummer*, 114 Ohio App.3d 456, 470-471 (7th Dist. 1996), citing *Partsch v. Haskins*, 175 Ohio St. 139,

140, 191 N.E.2d 922 (1963) (the right to a speedy trial is "a right which must be claimed or it will be held to have been waived."); *State v. Mock*, 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, ¶ 15 (7th Dist.); *State v. Hergenroder*, 7th Dist. Columbiana No. 07 CO 17, 2008-Ohio-2410, ¶ 13.

**{¶22}** "[T]he failure to raise the question of such a violation denies the [state] the opportunity to establish that tolling of the statute occurred." *State v. Turner*, 168 Ohio App.3d 176, 2006-Ohio-3786, 858 N.E.2d 1249, ¶ 22 (5th Dist.). Due to the failure to raise speedy trial issues in the trial court, the state had no obligation to make a record of the reasons for any delays in the proceedings below to demonstrate that Appellant Brian was afforded his right to a speedy trial. *Id.* Accordingly, this assignment of error is overruled.

Second Assignment of Error: Waiver of Attorney's Potential Conflict of Interest

**{¶23}** Appellant Brian's second assigned error asserts:

"The trial court committed reversible error as a Waiver of Conflict was not filed in the above captioned matter, where co-defendants utilized a single attorney in a consolidated case."

**{¶24}** Appellant Brian claims the trial court did not secure a knowing and voluntary waiver of conflict from the co-defendants regarding their decision to use the same defense counsel. He claims there is no oral or written waiver of conflict filed with the court, and as a result, there "may" have been resulting prejudice. The factual premise for Appellant Brian's argument is partially correct. Although there is no written waiver of potential conflict of interest signed by him and filed with the trial court regarding their decision to use the same defense counsel, the trial court conducted an oral conflict-of-interest inquiry during which the court addressed each defendant individually.

**{¶25}** A criminal defendant has the right to counsel that is free from conflicts of interest. *State v. Williams*, 166 Ohio St.3d 159, 2021-Ohio-3152, 184 N.E.3d 29, ¶ 6. However, a trial court does _not_ have an independent obligation or duty to inquire as to conflicts when faced with co-defendants employing the same counsel unless there is some indication alerting the trial court to incompatible interests. *Id.* ("A trial court's affirmative duty to inquire into multiple representation of codefendants arises when the trial court knows or has reason to know that a possible conflict of interest exists or when

Case No. 22 CO 0002

a defendant objects to the multiple representation.").  And absent an objection or some other circumstance indicating the court should have known about a possible conflict, the court may assume there is no conflict or that the defendant is aware of the risk and accepted it.  *Williams*, *supra*, at ¶ 16, citing *State v. Ingol*, 89 Ohio App.3d 45, 49, 623 N.E.2d 598 (9th Dist.1993).

**{¶26}** Moreover, "the right to be represented by an attorney free of conflicts must be balanced against 'the right of a defendant who does not require appointed counsel to choose who will represent him.'"  *State v. Smith*, 3rd Dist. Hancock No. 5-11-10, 2012-Ohio-5020, ¶ 26, citing *U.S. v. Gonzalez-Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557 (2006).  Thus, the conflict must be raised or the court must have some actual reason or notice before it is required to inquire.  For example, if co-defendants are assigning blame on one another; making inconsistent statements; or putting forth competing defense strategies, then an inquiry is likely necessary.  *Id.*  According to the Ohio Supreme Court in *Williams*, the mere possibility of a conflict of interest is not enough to require a trial court to inquire.  *Id.* at ¶ 19.

**{¶27}** Further, Appellant Brian does not identify nor has this court found a rule, statute, or case requiring a trial court to secure a written waiver of a potential conflict of interest to be filed with the clerk of courts in a case.

**{¶28}** The trial court initiated the following dialogue regarding a possible conflict of interest at the beginning of an April 2021 status conference:

THE COURT:  We are dealing with three cases here * * *.
Now, I note that all three defendants are here with Mr. King as counsel.
And I know, Mr. King, I asked you about this before, but you are satisfied – and I leave it up to you, you know the facts better than I, but this is not a conflict of interest situation for you[?].

MR. KING:  Judge, that has already been explored with all my clients, and, no, there is no conflict of interest and [there] doesn't appear to be any on the horizon at all.

* * *

THE COURT:  * * * Now, Mr. King, we have set this for one jury trial based on your representation to me that you have discussed the matter of,

I guess, would be trifurcation of – which your clients could insist upon, and the Court would make a decision as to whether to try all three of them together or to try them separately.

MR. KING: Judge, that has been discussed with all three of my clients, and it's * * * -- our agreement and – for the record – that would be – have – combining all three cases to one jury trial. * * *

THE COURT: All right. And you've had a full discussion with your clients as to the possible issues one way or the other on the question of –

MR. KING: In regards to having separate trials and then of course each of them testifying as witnesses on what particular defendant would go forward with a jury trial, and I also indicated that I would need to reduce that to a written document, and going to have it circulated so that they can all sign it[,] and I'll file originals in each of their cases then.

(April 13, 2021 Tr. 2-6.)

{¶29} At that point, the court indicated it is available for individual motion hearings if counsel requested them, and Mr. King responded that he did not anticipate the need for separate motion hearings. The judge then indicated he was going to consolidate the three cases anticipating a written consent agreement, as indicated by the defendants' counsel. The court then addressed each of the three defendants individually and asked the same questions.

{¶30} The trial court judge spoke directly to Appellant Brian and asked:

THE COURT: * * * first, which one of you is Brian? Okay. Do you understand what we are talking about here?

MR. BRIAN ALLEN: Yes, sir.

THE COURT: All right. And I know you have had extensive discussion with Mr. King about the benefit or detriments of consolidating the cases. What is your wish? You want to try all three together?

MR. BRIAN ALLEN: Yes, Your Honor, I would like to have them all three together.

THE COURT: Okay. * * *

Case No. 22 CO 0002

\* \* \*

All right, Mr. King, you'll follow that up with a written waiver?

MR. KING: Yes, Your Honor.

(April 13, 2021 Tr. 7-8.)

**{¶31}** At that juncture, the trial court judge instructed counsel to let him know if the wishes of the defendants changed regarding the consolidation of the trial. The court then asked the state if it consented to the consolidation of the cases for trial, and the prosecutor indicated it had no objection at this point but that it would advise if any issues arose about consolidation.

**{¶32}** Thereafter, at the June 9, 2021 status conference, the issue was again referenced. The court asked:

Now gentlemen, \* \* \* we are scheduled to have a jury trial. We are having all three Defendants tried at the same time, and your clients have specifically waived any conflict that might - - they are aware of the potential conflicts; am I correct?

Mr. King: That has been addressed, Your Honor.

(June 9, 2021 Tr. 10-11.)

**{¶33}** Here, the three co-defendant's theory of the case and their defenses were largely consistent—they were not blaming one another or putting forth competing defense strategies such that the trial court likely had actual notice sufficient to require it to inquire about a conflict. Nevertheless, it appears the court fully vetted the issue, and as such, Appellant Brian's second assignment of error lacks merit.

<u>Third Assignment of Error: Sufficiency of the Evidence</u>

**{¶34}** Appellant Brian's third assigned error asserts:

"The trial court committed reversible error as there was insufficient evidence offered by the Plaintiff/Appellee, State of Ohio, to establish elements of the crime of assault."

**{¶35}** Whether the evidence is legally sufficient to sustain a verdict is a question of law, which appellate courts review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3.

{¶36} On appeal we determine whether the evidence presented, allows a rational trier of fact to find the essential elements of the crime established beyond a reasonable doubt. *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, *recon. denied sub nom. State v. Walker*, 160 Ohio St.3d 1517, 2020-Ohio-6946, 159 N.E.3d 1179.

{¶37} Appellant Brian argues his convictions are not based on sufficient evidence because there was conflicting testimony about who was the aggressor and there was no conclusive evidence or video recording actually showing him push Dillon, consistent with Dillon and Rhonda's testimony. We disagree.

{¶38} Appellant Brian was convicted of assault in violation of R.C. 2903.13(A), which states: "No person shall knowingly cause or attempt to cause physical harm to another * * *." Appellant Brian claimed self-defense. Thus, the state had the burden of showing beyond a reasonable doubt that he did not use the force in self-defense, or in other words, his act of pushing Dillon was conduct not in self-defense. R.C. 29001.05(B)(1).

{¶39} Dillon testified Appellant Brian was the initial aggressor but his other two uncles likewise attacked him. He said Appellant Brian "rushed him" or "ran up on him" and pushed Dillon onto the hood of a car. Then Daniel and David pulled him off of the car before Appellant Brian got on top of him. He said when he was on the ground, all three were standing above him, and he had cuts on his legs. When he was able to stand, he recalls "Danny" chasing him down the street screaming at him until Dillon picked up the cement paver or brick. (Tr. 207-208.)

{¶40} Dillon's mother Rhonda testified she did not see who threw the first punch but remembers Appellant Brian was the aggressor. She said she had seen "Brian come at Dillon." Then "Dave and Dan" showed up, and they all started fighting with Dillon. She said, "[t]hey beat him up. * * * He got away, at one point, and they went after him again." (Tr. 280.) Bud, Rhonda's boyfriend, also testified that Appellant Brian was the initial aggressor. He recalls Appellant Brian grabbing Dillon and then the other two brothers got out of their trucks, and the fight escalated. Bud also recalls Appellant Brian and Dillon yelling at one another about disrespect.

{¶41} Bud said the other two brothers joined the fight and were grabbing, pushing, and pulling on Dillon all while yelling at each other. The three brothers had Dillon against the hood of a car. Bud also said at some point, all three were kicking and punching, and when Dillon broke free, all three chased him down the street. Bud also recounted Appellant Brian stating he "owns this fucking street, owned this fucking town, and owned the fucking cops." (Tr. 315-318.)

{¶42} In Defendants' Exhibit D, a jump drive containing doorbell video footage, Daniel can be seen in a black t-shirt on the far side of the hood of the car leaning over and grabbing and reaching toward Dillon while Dillon is sliding off the other side of the hood of the car. Dillon then loses his footing, and Appellant Brian then picks Dillon up and puts him back toward the center of the hood within Daniel's reach. Multiple people can be seen reaching and grabbing toward Dillon, including Appellant Brian, before Dillon is able to slip free and run away backward with Appellant Brian and Daniel following after him in an aggressive manner. Appellant Brian and Daniel can be seen leaning toward Dillon, grabbing and pulling at him while he had his back up against the car. (Def. Exh. D.)

{¶43} Rhonda's call to 911 was played at trial, and during the audio recording, she can be heard yelling to the 911 operator, stating: "they are ganging up on one person." She can then be heard yelling at someone in the background, saying "that is exactly what you guys did." (State's Exhibit 5.)

{¶44} In State's Exhibit 7, according to the body camera footage of Chris Green, Dillon is seen and heard telling then-officer Green what occurred. Dillon states after returning the deer head to his grandmother, his uncle Brian "bum-rushed" him. Dillon said then all three of his uncles were beating him. He said they were "kicking the shit out of me. They keep coming after me." He said Dave hit him while he was on the ground.

{¶45} Dillon told Green his uncles were upset because he was "disrespecting his grandmother." Dillon admitted he tried to defend himself. He also said they were upset because he had his father's crossbow, which they did not want him to have. During his conversation with Green, Dillon stated he was not using drugs at the time and was on suboxone from his doctor. Also, during this recording, Dillon can be heard telling Green

the police should secure the footage from the neighbor's video doorbell camera. Dillon then said he just wants to get his stuff and leave. (State's Ex. 7.)

**{¶46}** Thereafter, the recording depicts Green speaking with Rhonda, who is seen crying and is very upset. She said, "they were like three raging bulls. Who does that?" She then asked Green if she can leave. (State's Ex. 7.)

**{¶47}** Green testified for the defense and said he was forced to file the charges against the Allen brothers, even though he did not think there was probable cause to do so. (Tr. 448-450.) Green was terminated from the local police department, in part, for dishonesty and making false statements in connection with this investigation. (Tr. 405.) There was also testimony Green was a close friend of the Allen brothers; he had been fishing with Brian; and they went to an Ohio State football game together. (Tr. 375.) Green claims he was wrongfully terminated. (Tr. 450.) The local police captain Fred Flati testified:

> Chris [Green] failed to actually address our whole reason for being there—the assault. He failed to [obtain] any–any information pertinent to that incident, which would, you know, make our investigation a little easier.
>
> He lied to me. He lied to Officer Watkins. And, I mean, being a police officer lying you know, to * * * adversely affect an investigation—unacceptable.

(Tr. 405.)

**{¶48}** After arriving at the scene of the altercation, Green accused Dillon of having a white substance on the outside of one of his nostrils. The substance is not seen by others at the scene and not visible in the body camera footage. Dillon denied using illegal drugs at the time, and Flati testified Dillon did not show any signs of impairment. (Tr. 400.)

**{¶49}** During Officer Justin Watkins' body camera footage, Watkins can be seen approaching the Allen brothers before he fist-bumps Daniel. Watkins then turned off his camera before speaking with them. (State's Ex. 7.) Flati said Watkins was a close friend of the Allen brothers as well, which Watkins acknowledged during his testimony. (Tr. 375.)

**{¶50}** Based on the foregoing, there was more than enough evidence showing Appellant Brian knowingly caused or attempted to cause physical harm to Dillon. Further, Rhonda, Dillon, and Bud testified Appellant Brian was the aggressor, and Dillon testified Appellant Brian pushed him first. Appellant Brian can also be seen lunging and pulling at Dillon while Dillon is backward on the hood of a car, and the state introduced images of scrapes and bruising Dillon suffered as a result of the altercation.

**{¶51}** Thus, a rational trier of fact could find the essential elements of assault beyond a reasonable doubt and Appellant Brian was not acting in self-defense. This assigned error lacks merit.

<u>Fourth Assignment of Error: Weight of the Evidence</u>

**{¶52}** Appellant Brian's fourth assigned error asserts:

"The trial court committed reversible error as the conviction for assault was against the manifest weight of the evidence."

**{¶53}** A manifest weight review requires us to review the evidence and to determine whether this is an exceptional case in which it is patently apparent the jury lost its way. *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541 (1997). The reversal of a jury's verdict on manifest weight grounds requires a unanimous concurrence of all three judges. *Id.*

> The * * * weight of the evidence addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? * * * [A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.' * * *.

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶54}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis,* 8th Dist. Cuyahoga

No. 98538, 2013-Ohio-1184, ¶ 18, citing *Iler v. Wright,* 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

**{¶55}** As stated, Appellant Brian was convicted of assault in violation of R.C. 2903.13(A), which states: "No person shall knowingly cause or attempt to cause physical harm to another * * *." Appellant Brian asserted self-defense. Thus, the state had the burden of showing beyond a reasonable doubt that he did not use the force in self-defense. R.C. 29001.05(B)(1).

**{¶56}** Appellant Brian contends the state failed to establish he did not act in self-defense and Appellant Brian did not cause or attempt to cause any of Dillon's "physical harm."

**{¶57}** Dillon testified after arriving at his grandparents' home, he handed his grandmother the deer head and that is when Appellant Brian "bum-rushed" him, explaining:

It all happened so fast, honestly. It was kind of a blur. I mean, it was about me disrespecting his mother because I told her no. * * *

* * *

[Brian was] immediately attacking me. I was getting hit, choked, punched, everything you could * * *, I was immediately defending myself. Like, he had pushed me onto the hood of the Saturn.

* * *

He ran up on me. I mean, I am 140 pounds. He threw me around like a rag doll, honestly. I was * * * scared.

* * *

* * * I was doing everything I could do to defend myself. But, like I said, * * * all I could do was wiggle around.

(Tr. 203-205.)

**{¶58}** Rhonda testified she and Bud were picking up bags of Dale's belongings while Brian and Dillon were yelling back and forth. She turned around and saw "Brian go toward Dillon and the fight was on." (Tr. 279.) She did not see who initiated the physical force but said they collectively "beat him up." (Tr. 281-282.)

**{¶59}** Bud recalled Dillon handing his grandma the deer head before Dillon and Appellant Brian began arguing about respect. Bud said Appellant Brian was "definitely the aggressor" and explained it was "more like grabbing" before the other two brothers got involved and "[j]oined the fight." Bud agreed at some point during the altercation, all three brothers were throwing punches, kicking, and doing things like that while Dillon was "[r]ight in the middle of it all." (Tr. 316.)

**{¶60}** Appellant Brian testified he is six feet, five inches tall and weighs 375 pounds. (Tr. 634.) Appellant Brian acknowledges shoving Dillon about six to eight feet away from him, but claims it was only after Dillon "sucker-punched" him. Appellant Brian testified Bud and Rhonda made up his alleged statements that he owned the police, the street, and the town. (Tr. 654.)

**{¶61}** Contrary to Appellant Brian's arguments, this is not an exceptional case in which the jury clearly lost its way. His conviction is not against the manifest weight of the evidence. As for Appellant Brian's claim of self-defense, the evidence was before the jury for it to consider, and it did not believe Appellant Brian's version of the facts. Thus, we defer to the jury's decision. *DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Johnson*, 7th Dist. Mahoning No. 19 MA 0030, 2020-Ohio-3640, ¶ 7 (the jury is in the best position to view the witnesses, and to observe their demeanor, gestures, and voice inflections). This assignment lacks merit.

## Conclusion

**{¶62}** Appellant Brian waived his speedy trial argument on appeal by failing to pursue a motion to dismiss on speedy trial grounds to the trial court. Appellant Brian's claimed denial of conflict-free counsel argument also lacks merit since the matter was addressed by the court. Last, Appellant Brian's assault conviction is supported by sufficient evidence and not against the manifest weight of the evidence. Because each of his arguments on appeal lack merit, we affirm the trial court's decision.

Waite, J., concurs.

D'Apolito, J. concurs.

Case No. 22 CO 0002

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the East Liverpool Municipal Court of Columbiana County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**