[Cite as *State v. Moreland*, 2026-Ohio-2310.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. Nos. 30449; 30450 |
| Appellee | : | |
| | : | Trial Court Case Nos. 2023 CR 03499; |
| v. | : | 2024 CR 00649/1 |
| | : | |
| TOMMY MORELAND | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 18, 2026, the judgments of the trial court are affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

MARY K. HUFFMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

MONTGOMERY C.A. Nos. 30449; 30450

ANTHONY D. MAIORANO, Attorney for Appellant
ANDREW T. FRENCH, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Tommy Moreland appeals from his judgment entries of conviction on multiple charges, including murder and felonious assault. For the following reasons, the judgments of the trial court are affirmed.

**Procedural History**

{¶ 2} On December 15, 2023, Moreland was indicted on one count of failure to comply with an order or signal of a police officer ("failure to comply") after he fled from police in a rented Toyota RAV4. At the time of the offense, law enforcement suspected that Moreland was involved in the shooting death of 15-year-old H.W., which occurred earlier on the same day, November 17, 2023, around 7:00 a.m., at the intersection of Philadelphia Drive and Turner Road. H.W. was shot in the head while sitting in the passenger seat of a white Impala driven by Baretta Byrdsong, a staff member of the group home where H.W. resided. On March 13, 2024, Moreland was indicted on two counts of murder, three counts of felonious assault, two counts of tampering with evidence, and one count each of discharging a firearm on or near prohibited premises and improper handling of a firearm in a motor vehicle. All counts but the tampering with evidence charges included a three-year firearm specification and a specification for discharging a firearm from a motor vehicle. On August 27, 2024, the State moved to join both cases for trial. Over objection by Moreland, the court granted the motion.

{¶ 3} Although trial was scheduled for September 30, 2024, on September 2, 2024, Moreland sought and received a continuance until March 10, 2025. On March 4, 2025, a notice of substitution of counsel was filed by two attorneys on behalf of Moreland. At the final pretrial conference the following day, the court advised substitute counsel to be prepared for trial as scheduled. It declined substitute counsel's request for a continuance and ordered current defense counsel to proceed with his representation of Moreland if substitute counsel was not prepared to proceed to trial.

{¶ 4} At trial, twenty-two witnesses provided testimony on behalf of the State, and Moreland was found guilty of all counts and specifications. Disposition occurred on April 9, 2025. After merger, the court sentenced Moreland to an aggregate prison term of 37 to 46.5 years to life for his convictions of the offenses charged in the murder case to be served consecutively to a term of 36 months for his conviction of failure to comply. Moreland timely appealed, asserting three assignments of error.

## Assignments of Error and Analysis

### I. Denial of Motion to Substitute Counsel

{¶ 5} In his first assignment of error, Moreland argues that the Court violated his Sixth Amendment "right to counsel of his choosing" in two respects. First, he argues that upon the filing of his notice of substitution of counsel six days before his trial was scheduled, the court improperly ordered substitute counsel to be prepared for trial as scheduled and denied his substitute counsel's motion to continue. He claims that he and defense counsel "were not communicating effectively," and the motion to substitute counsel accordingly should have been granted.

{¶ 6} Second and "[m]ost relevant," Moreland asserts that Christian Fannon, who testified that Moreland confessed to the shooting, previously had been represented by the

3

Office of the Public Defender, where Moreland's counsel was employed. Moreland asserts that the prior representation of Fannon created another conflict of interest for defense counsel. He directs our attention to *State v. Hackney*, 2021-Ohio-2064 (6th Dist.), for the proposition that the potential for conflict arises especially in the context of cross-examination.

{¶ 7} The State responds that any conflict related to the prior representation of Fannon was never raised before the trial court, and "based on the totality of the circumstances, the trial court did not abuse its discretion in the manner in which it handled Moreland's motion to substitute counsel." It argues that there is no reason to believe that the past representation of Fannon "impacted [defense counsel's] cross examination" of Fannon, and that any conflict between Moreland and defense counsel did not prevent an adequate defense.

{¶ 8} In reply, Moreland argues that a duty to inquire arises "where a court knows or reasonably should know of an attorney's possible conflict of interest" and that "the failure to inquire into the possible conflict creates a presumed prejudice." He asserts that defense counsel made the court aware of a conflict in the form of the breakdown in communication between him and Moreland, and that another "possibility of a conflict" existed based on defense counsel's prior representation of Fannon. According to Moreland, the trial court's "lip service" to him at the final pretrial conference "could not amount to a proper inquiry," citing *State v. Smith*, 2012-Ohio-5020, ¶ 32 (3d Dist.) ("In [*State v. Johnson*, 2010-Ohio-315, ¶ 3 (3d Dist.)] a review of several seminal United States Supreme Court cases clearly demonstrated that where a trial court knows or reasonably should know of an attorney's possible conflict of interest in the representation of a person charged with a crime, the trial court has an affirmative duty to inquire whether a conflict actually exits.").

4

{¶ 9} A trial court's decision on a motion to substitute counsel is reviewed under an abuse of discretion standard. *State v. Murphy*, 91 Ohio St.3d 516, 523 (2001). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). Most instances of abuse of discretion occur when a trial court makes a decision that is unreasonable. *State v. Gilbreath*, 2022-Ohio-3759, ¶ 8 (2d Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "'A decision is unreasonable if there is no sound reasoning process that would support that decision.'" *Id.*, quoting *AAAA Ents.* at 161.

{¶ 10} While the Sixth Amendment comprehends the right to select and be represented by one's preferred attorney, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *State v. Nicholson*, 2007-Ohio-6653, ¶ 12 (8th Dist.), citing *State v. Cobb*, 2007-Ohio-1885 (4th Dist.), citing *Wheat v. United States*, 486 U.S. 153, 159 (1988). An indigent defendant is entitled to competent representation but not to have a particular attorney of his choosing represent him. *State v. Brock,* 2017-Ohio-759, ¶ 25 (2d Dist.).

{¶ 11} Multiple factors bear consideration when evaluating a request to substitute counsel. The trial court must balance "'the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.'" *State v. Chatmon,* 2016-Ohio-1201, ¶ 8 (5th Dist.), quoting *State v. Jones*, 91 Ohio St.3d 335, 343 (2001). The timeliness of a substitution motion is also a crucial factor in determining whether a denial of a motion to substitute counsel constitutes an abuse of discretion; a trial court's "difficult responsibility of assembling witnesses, lawyers and jurors for trial 'counsels against

5

continuances except for compelling reasons.'" *State v. Howard*, 2013-Ohio-2884, ¶ 40 (5th Dist.), quoting *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

{¶ 12} In considering these factors, courts have "'wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar.'" *State v. Frazier*, 2012-Ohio-1198, ¶ 26 (8th Dist.), quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006). To "justify the discharge of court-appointed counsel, a defendant must show "'good cause, such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result."'" *Id.* at ¶ 27, quoting *State v. Pruitt*, 18 Ohio App.3d 50, 57 (8th Dist. 1984), quoting *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972).

{¶ 13} In terms of a breakdown of the attorney-client relationship, the dispute must be "'of such magnitude as to jeopardize [a] defendant's Sixth Amendment right to effective assistance of counsel.'" *Brock*, 2017-Ohio-759, at ¶ 25 (2d Dist.), quoting *State v. Coleman*, 2015-Ohio-5381, ¶ 10 (2d Dist.). "'Disagreement between the attorney and client over trial tactics and strategy does not warrant a substitution of counsel. Moreover, mere hostility, tension, and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense.'" *Id.*, quoting *Coleman* at ¶ 11.

{¶ 14} In *Hackney*, cited by Moreland regarding cross-examination where a conflict is present, the appellant claimed that the trial court abused its discretion in granting the State's motion to disqualify defense counsel, and the Sixth District affirmed. *Hackney*, 2021-Ohio-2064, at ¶ 1 (6th Dist.). Defense counsel's simultaneous representation of the defendant and a witness for the State created a serious potential conflict of interest, which disqualified counsel from representing defendant. Because "the purpose of cross-

6

examination is to discredit any testimony that is favorable to the state, it [was] unlikely that [counsel] could vigorously cross-examine [the State's witness] while having her as a client." *Id.* at ¶ 14. Under those circumstances, *Hackney* found that "the serious potential conflict is clear." *Id.* at ¶ 16.

Final Pretrial Hearing

{¶ 15} Here, at the final pretrial hearing, five days before trial, the court noted that the motion to substitute counsel had been filed in the late afternoon on the previous day. The court indicated that it had spoken to substitute counsel on the phone and advised them that Moreland "can have any attorney that he wants representing him" at trial, but they would need to be ready to proceed as scheduled because the court was not inclined to grant another continuance. Substitute counsel stated that neither of them was prepared and that they would need "as much time as the Defendant felt fair" to review discovery and talk to witnesses.

{¶ 16} The court stated that the trial date was continued once for an extended period at Moreland's request, and the court had advised counsel and Moreland at the time of the first continuance that the matter would not be continued again. The court noted that Moreland was made aware of the March 10, 2025 trial date when his motion for continuance was granted in September 2024. It was significant to the court that the matter had been on the court's docket for quite some time, it stressed a need to move forward, and it stated it was aware that original defense counsel was prepared for trial. The court further indicated that "the record should reflect that [substitute counsel] filed the motion prior to even asking the court whether or not a continuance would be granted in this case." It advised substitute counsel that they "take on the role in the same condition as the prior counsel had and have to honor those dates unless some relief was sought from the court to do otherwise." When

7

asked by the court, substitute counsel did not specify the amount of time they sought to prepare for trial but instead sought as much time of the Moreland thought was fair. Under such a circumstance, the trial court was left without any clear indication of the length of the continuance requested.

{¶ 17} Original defense counsel confirmed that he was prepared to proceed but asked to withdraw given Moreland's apparent financial ability to retain counsel. He advised that he had learned of Moreland's plan to obtain substitute counsel while listening to his recorded phone calls from the jail on the previous day, citing "a very distinct difficulty and difference of opinion between [him and Moreland] in regard to trial strategy." Defense counsel joined the request to continue.

{¶ 18} The court noted there was "nothing before the Court on the amount of money that [Moreland] paid to the other counsel, nor where that money came from." It indicated that when it appointed defense counsel, Moreland was deemed indigent and "that opinion has not changed with the Court." The court ordered counsel to continue representation because substitute counsel was not prepared.[1] It further stated that any breakdown in communication was "pretty suspicious a few days before trial." The court confirmed again that defense counsel was prepared to proceed to trial.

{¶ 19} The prosecutor then informed the court, in accordance with Marsy's Law, that the victim's family sought justice and opposed any continuance. She advised that the State opposed another continuance based on the serious nature of the case, as well as the fact that certain witnesses were already wary about their safety. The prosecutor expressed concern that a continuance would damage the State's case and jeopardize its ability to retain

---

1. Moreland's indigency status was not a factor in the trial court's analysis of the motion to substitute counsel. Defense counsel retained an ethical obligation of representation to Moreland until withdrawal was permitted. See Prof.Cond.R. 1.16.

8

the cooperation of its witnesses, a couple of whom were incarcerated. When given an opportunity to provide his input on the request to substitute counsel and continue the trial a second time, Moreland responded, "Sir, I don't have nothing to say." The court then noted that both the prosecutor and defense counsel were "experienced . . . and they know what's required for preparation for the trial."

Prior Representation of the State's Witness Fannon

{¶ 20} The parties do not dispute that Fannon was previously represented by defense counsel and the Law Office of the Public Defender. At no time at the final pretrial, however, was any alleged conflict regarding the prior representation brought to the court's attention. Still further, the trial record is utterly devoid of any reference throughout the course of the trial regarding any conflict of interest with defense counsel and Fannon related to prior representation.

{¶ 21} *Hackney* involved a blatant conflict of interest based on divergent interests and concurrent representation that was brought to the court's attention. In contrast, here the trial court was without any knowledge of the alleged conflict of interest or the claim that defense counsel had previously represented Fallon. When the court gave Moreland an opportunity to respond with any concerns about his request to substitute counsel and continue the trial again, concerns which might have included defense counsel's prior representation of Fallon, he chose to remain silent. As further discussed below, defense counsel, a skilled advocate, thoroughly cross-examined Fannon, effectively casting doubt on his credibility. In the absence of any awareness of a conflict, which Moreland himself characterizes in his brief as a speculative "possibility," no affirmative duty to inquire arose. The trial court simply could not have been expected to inquire about an issue about which it had no knowledge. Absent an irreconcilable conflict or a record that the trial court was aware of any "possible" conflict,

9

the record belies Moreland's assertion that the trial court failed to make all necessary inquiries or erred in denying the substitution of counsel.

Alleged Breakdown in Communication

{¶ 22} Although counsel asserted that there was a breakdown in communication over trial strategy, such last-minute disagreement is not unusual and did not warrant substitution. This is because the record reflects that Moreland's right to the effective assistance of counsel was never jeopardized. Defense counsel generally described a breakdown in communication solely related to trial strategy, without providing the court with insight with which to weigh the alleged conflict. Further, the timeliness of the motion to substitute weighed heavily in favor of requiring substitute counsel to proceed to trial as scheduled out of fairness to the State's concerns and Moreland's knowledge that another continuance would not be granted. Numerous witnesses had been subpoenaed, Moreland had been aware of the trial date for six months, the court properly considered the demands of its calendar, and no compelling reason was provided for the late substitution. As the trial court noted, considering the late date that the alleged "conflict" or dispute between defense counsel and Moreland was reported, the merits of the untimely motion to substitute counsel appeared more "suspicious" than legitimate, suggesting a mere change of heart. This conclusion is supported by Moreland's statement that he had nothing to say. Moreland did not provide any information about any alleged breakdown in communication, any potential conflict regarding the prior representation of Fannon, or his purported ability to retain counsel.

{¶ 23} In the absence of good cause, an abuse of discretion is not demonstrated. Moreland's first assignment of error is accordingly overruled.

10

## II. Ineffective Assistance of Counsel

### Failure to Object to Fannon's Testimony

{¶ 24} In his second assignment of error, Moreland argues that he was denied his right to the effective assistance of counsel for six reasons. In his first argument, Moreland claims that trial counsel's performance was deficient when he failed to object to Fannon's testimony characterizing H.W. as a "little girl" who could have been a member of his own family. According to Moreland, Fannon's repeated characterizations of H.W. were not relevant, invoked and inflamed the passions of the jury, and improperly bolstered Fannon's credibility. He further argues that counsel's failure to object "is especially troubling in light of the Montgomery County Public Defender's office representing Fannon as recently as December of 2021." Moreland claims that counsel's failure rose to the level of reversible error. In his reply brief, he specifies that Fannon's characterizations of H.W. "improperly gave him credibility as a father figure for H.W., when he had no relationship with her when she was alive."

{¶ 25} To prevail on an ineffective assistance of counsel claim, a defendant must prove that his attorney was ineffective under two-part analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 26} As to the first part, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State*

11

*v. Bird*, 81 Ohio St.3d 582, 585 (1998). "A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel." *State v. Russell*, 2007-Ohio-137, ¶ 50 (2d Dist.). "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992).

{¶ 27} If the first part is met, then "prejudice" may be considered. To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, (1989) first paragraph of the syllabus. Speculation does not prove either part of the *Strickland* analysis. *State v. Morgan*, 2017-Ohio-7565, ¶ 53 ("speculation cannot prove prejudice"); *State v. Powell*, 2012-Ohio-2577, ¶ 86 (speculative argument cannot be a basis for finding deficient performance under an ineffective assistance of counsel claim). A "court need not [first] determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

{¶ 28} "[T]he decision to object or not object is within the strategic consideration of trial counsel." *State v. Villani*, 2019-Ohio-1831, ¶ 19 (12th Dist.). Put differently, the "[f]ailure to make objections does not automatically constitute ineffective assistance of counsel . . . ." *State v. Homer*, 2006-Ohio-1432, ¶ 15 (12th Dist.). "This is because '[o]bjections tend to disrupt the flow of a trial and are considered technical and bothersome by a jury.'" *State v. Kaufhold*, 2020-Ohio-3835, ¶ 58 (12th Dist.), quoting *State v. Steele*, 2005-Ohio-943, ¶ 100 (12th Dist.). *See State v. Wilson*, 2019-Ohio-338, ¶ 28 (12th Dist.) (noting that excessive objections, or objections to otherwise trivial matters, can negatively impact the jury's opinion of the defendant).

{¶ 29} Fannon testified regarding the discussions he had with Moreland while they were housed together in jail in March 2024. Fannon detailed his extensive criminal history, and at the time of trial, he was serving a two-year prison term. Fannon stated that he had two children, and he had been in prison "[p]retty much their whole life. They're very bitter, and they have a lot of bad feelings."

{¶ 30} Fannon testified that, due to his lengthy experience behind bars, fellow inmates sought him out for advice, including Moreland. According to Fannon, Moreland related that, at a gas station, he saw a vehicle occupied by someone whom he had been disputing with, followed the vehicle, and shot at it multiple times. Fannon recalled that Moreland said that, in the vehicle, "there was a girl that was going to school" whom he shot, and that Moreland advised him that he "didn't give a f***" about the girl. Fannon identified State's Exhibit 165 as a statement he wrote "verbatim" of Moreland's statements to him.

{¶ 31} According to Fannon, immediately upon his release from jail on bond, he noticed a member of law enforcement crossing Second Street, stopped him, and told him that he had information about Moreland. Fannon said that he was then put in contact with Detective Alec Denker, to whom he provided State's Exhibit 165. Fannon stated he did so because "it disturbed me what happened. And I thought about that could have been my daughter. Could have been my niece, -- my sister."

{¶ 32} When asked how he felt about Moreland's admissions, Fannon replied, "just a little girl. It's a little girl, like why? That little girl just got killed. Like I said, it could have been my daughter, my sister . . . So it's just a tragic situation." He stated that he had serious concerns about his safety for testifying, but there "was a little girl that was killed, and I mean, if that was my daughter, my sister, my niece, I'd want the truth to be known[.]   And I would be wrong to not have told the truth."

13

{¶ 33} When Fannon testified, the jury was already aware that H.W. was only 15 years old at the time of her murder. They had viewed her autopsy photos and learned from the deputy coroner who performed the autopsy that her cause of death was multiple gunshot wounds. Fannon referenced H.W.'s age twice and only in response to specific questions testing his credibility and motive for approaching law enforcement with the information he claimed Moreland provided to him. Moreland does not explain how Fannon's statements invoked and inflamed the passions of the jury, given what they had already seen and heard. The jury may have considered any objection to Fannon's acknowledgment of H.W.'s age trivial based on the gravity of the charges against Moreland. As trial strategy, defense counsel may have chosen to refrain from highlighting the victim's age through objection. Any suggestion that the jury perceived Fannon as a credible paternal figure is belied by his admission that he was never a part of his own children's lives and they resented him.

{¶ 34} As the State asserts, Fannon's "motivation for snitching on a fellow inmate . . . was at the heart of the jury's determination of [his] credibility." The transcript of Fannon's cross-examination reflects that defense counsel's strategy was to thoroughly and vigorously contest his believability and emphasize his lengthy criminal history, history of dishonesty, and self-serving pattern of seeking "deals" with the State. While being questioned by defense counsel, Fannon acknowledged that he had several convictions for falsification involving lying to law enforcement and that he had pending charges when he contacted the detective about Moreland's admissions. He further conceded that he had offered information to defense counsel in the past and received "rewards." Fannon acknowledged that he falsely told the detective that State's Exhibit 165, his written statement, was written by Moreland because he was nervous and did not want to incriminate himself. Fannon admitted that, after disclosing the information about Moreland and despite being repeatedly told that the State

14

would not offer him any consideration for his testimony, he wrote to the prosecutor and requested early judicial release because he was "very scared" for his safety. He repeatedly acknowledged that, despite his efforts, the State had not made him any promises, nor had it given him any consideration in his other cases in exchange for his testimony. Indulging the strong presumption that defense counsel's failure to object to the statements at issue was sound trial strategy for the above reasons, we cannot conclude that, but for counsel's alleged errors, the result of the trial would have been different.

{¶ 35} Finally, regarding the prior representation of Fannon by the Public Defender's Office, as discussed above, any possible conflict of interest was not raised before the trial court at any time. Moreland's vague suggestion of a potential conflict fails to explain beyond innuendo and speculation how the prior representation of Fannon affected defense counsel's trial strategy in light of counsel's vigorous cross-examination of Fannon. Ineffective assistance of counsel is not demonstrated, and this portion of Moreland's second assignment of error is overruled.

Failure to Object to GPS Data from the RAV4

{¶ 36} In the second portion of this assignment of error, Moreland argues that defense counsel was ineffective for stipulating to the authenticity of GPS records from the RAV4 at the time of the shooting. In addition to the GPS records, the parties stipulated to the authenticity of cell phone data from the phones of Denisha Taylor, Moreland, and Byrdsong. Moreland directs our attention to the testimony of former F.B.I. agent Kevin Horan, who created a company called Precision Cellular Analysis and was designated as an expert in cell phone technology. Moreland argues that Horan was "never proffered or deemed an expert in automobile technology" and that the GPS location records should have been retrieved and introduced by "an expert in the field of automobile electronics and data." He

15

asserts that there was no foundation laid for how the data from the RAV4 was collected, and the fact that Horan opined as to the location of the RAV4 "was incredibly prejudicial." Moreland concedes, however, that defense counsel's stipulation to the authenticity of the cell phone records "did not affect the outcome of the trial because Horan was able to properly interpret the cell phone records from AT&T and T-Mobile as an expert in cellular technology." The State responds that Moreland overlooks that it was prepared to authenticate the GPS records from the RAV4 in the absence of a stipulation, and that there was other evidence of the location of the RAV4 beyond Horan's testimony.

{¶ 37} The evidence related to GPS location, whether from the RAV4 or from the cell phones related to the location of various individuals, including Moreland, at or near the time of the shooting. Horan testified that his expertise extended to analyzing GPS data from vehicles, which he described as "rolling cell phones." He provided a peer-reviewed report to law enforcement of his analysis. Horan stated that he obtained the RAV4's GPS data from the Montgomery County Sheriff's office, and the data's location information included the date, time, latitude, and longitude of the vehicle. He also reviewed data from the cell phones of Taylor, Moreland, Byrdsong, as well as a photo of the RAV4's license plate at 7:02 a.m. from a Flock camera license plate reader. He testified that Taylor's phone provided GPS data. Finally, he obtained cell phone site information from service providers.

{¶ 38} In the course of Horan's testimony, the parties stipulated to the exhibit containing the GPS data from the RAV4 as an authentic record kept in the ordinary course of business by Enterprise Rent-A-Car. Horan stated that the cell phone data from the phones of Taylor and Moreland were consistent with the GPS data from the RAV4 and Taylor's GPS data. He opined that the sum of the data he received revealed that Moreland, Taylor, and the RAV4 were together at the location of the shooting and that they then travelled to Miami

16

Valley Hospital before proceeding to Flying Ace car wash locations in Moraine and Englewood. Sometime thereafter, the vehicle travelled at a speed of approximately 110 mph.

**{¶ 39}** Regarding the State's assertion that it was prepared to authenticate the GPS data from the RAV4, its March 3, 2025 witness list included the keeper of the records for rental contracts and car data from Enterprise Rent-A-Car, and a subpoena had been issued to the keeper of those records, facts of which defense counsel was no doubt aware. As the State further notes, no objection was raised to Horan's testimony, and Moreland does not argue that counsel was ineffective for failing to object to that testimony.

**{¶ 40}** Finally, as the State asserts, Detective Alec Denker of the Montgomery County Sheriff's Office provided additional testimony regarding the location of the RAV4. He testified that he contacted Enterprise on the afternoon of the shooting with a search warrant for the GPS data and obtained the data 13 minutes later. He further obtained video from a Speedway showing the RAV4 in the lot at 6:54:42 a.m., as well as Byrdsong and H.W. entering the convenience store at that Speedway at 6:54:45 a.m. Denker testified that the Flock camera system is the primary license plate reader used by his office, and that a Flock camera photo placed the RAV4 heading toward the Philadelphia Drive and Turner Road intersection, where the shooting occurred, at 7:02:16 a.m. Based on the foregoing, Moreland fails to meet his burden of showing that, but for the stipulation to the GPS data, there was a reasonable probability that the RAV4 records would not have been authenticated or that the outcome of the trial would have been different in the absence of the stipulation. Ineffective assistance of counsel is not demonstrated, and this portion of Moreland's second assignment of error is overruled.

## Failure to Request a Clarifying Instruction on Aiding and Abetting

**{¶ 41}** In the third portion of his second assignment of error, Moreland argues that defense counsel was ineffective for failing to request a clarifying instruction on aiding and abetting. He claims that defense counsel's theory of the case was that Taylor and another associate of Moreland's were the "true offenders," and that he was at Taylor's home until he accompanied her, after the shooting, in the RAV4 to clean it before returning it to Enterprise. Moreland argues that "only overt acts that took place during or before the commission of the offense can be used to establish complicity via aiding and abetting." He asserts that "being an accessory after the fact is not a crime in Ohio," and defense counsel "should have sought clarifying instructions . . . indicating that the mere fact Moreland may have assisted after the fact was insufficient to show complicity to murder." Specifically, Moreland argues that defense counsel should have requested the following instruction: "[T]he overt act of support, assistance, encouragement, cooperation with, or advisement or incitement to the principal must take place before or during the commission of the offense. Actions taken after the offense is completed are relevant only to whether the defendant shared the intent of the principal offender." Moreland directs our attention to *State v. Marshall*, 2019-Ohio-1154 (9th Dist.).

**{¶ 42}** The trial court instructed the jury, in relevant part, as follows:

A person who is complicit with another in the commission of a criminal offense is regarded as guilty, as if he personally performed every act . . . constituting the offense. This is true even if he did not personally perform every act constituting the offense or was not physically present at the time . . . the offense was committed.

. . .

Before you can find the Defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt the Defendant supported, assisted, encouraged, cooperated with, or advised or incited the principal offender in the commission of the offense and that Defendant shared in the criminal intent of the principal offender.

Such intent may be inferred from the circumstances surrounding the offense, including but not limited to, the presence, companionship and conduct before or after the offense was committed. The mere presence of the Defendant at the scene of the offense is not sufficient to prove, in and of itself that Defendant was an aider or abettor.

{¶ 43} The instruction provided to the jury conforms with *Ohio Jury Instructions*, CR § 523.03(B) (Rev. Feb. 6, 2016.). In *Marshall*, the court provided similar instructions to those above. The following instruction was also given: "Witnessing the crime or mere approval of the offense, even if the Defendant had guilty knowledge of the offense, does not by itself make the Defendant an aider or abettor." *Id.* at ¶ 28.

{¶ 44} Marshall argued, however, that the trial court erred by not providing an instruction that her "'conduct as an accessory after the fact is not criminal, and cannot constitute criminal conduct.'" *Marshall*, 2019-Ohio-1154, at ¶ 26 (9th Dist.) (quoting the proposed instruction). The court declined to issue the instruction because "it believed that the other instructions adequately covered the entire concept of aiding and abetting." *Id.* at ¶ 27. Marshall claimed that such an instruction would have changed the result "because the jurors would have understood that her knowledge and/or conduct, after the fact, could not support a charge of aiding and abetting." *Id.* at ¶ 26.

**{¶ 45}** *Marshall* found no abuse of discretion in the trial court's refusal to give the requested instruction. *Id.* at ¶ 28. It was significant to the Ninth District that the trial court "specifically advised the jury that a guilty verdict for aiding and abetting would require more than Marshall's mere presence, mere witnessing, or mere approval of C.O.'s crime," and that "a guilty verdict had to be based on Marshall's having 'supported, encouraged, assisted, cooperated with, advised, or incited' C.O.'s conduct while sharing his criminal intent." *Id.* at ¶ 28. The trial court's instruction in *Marshall* was consistent with the instructions provided in this case. Put differently, here the trial court's instructions covered the entire concept of aiding and abetting. Moreland's argument that defense counsel rendered ineffective assistance by not requesting an unnecessary jury instruction is without merit. This portion of Moreland's second assignment of error is overruled.

Failure to Object to Testimony of a Prior Dispute between Moreland and Byrdsong

**{¶ 46}** Moreland next argues that trial counsel was ineffective for failing to object to Byrdsong's testimony regarding an "irrelevant" and "incredibly prejudicial" video of a dispute between Byrdsong, D'Arko Red, and Moreland in September 2023. He claims that the State "used the specious argument between Moreland and Red as motive evidence" for him to shoot at Byrdsong.

**{¶ 47}** Byrdsong testified that on the date of the 2023 dispute, he brought his cousin downtown to obtain an ID. Byrdsong waited for his cousin in a white Impala on Third Street, which was also occupied by Red and a woman, and Byrdsong saw Moreland walking in their direction. Byrdsong identified a September 2023 video of him, Red, and Moreland from his phone that the woman accompanying them in the Impala recorded. According to Byrdsong, upon seeing Moreland, Red stated that he intended to fight Moreland, and Byrdsong got out

20

of the car with Red. An altercation ensued. Afterwards, Moreland fled, and Byrdsong and Red returned to the Impala.

**{¶ 48}** As the State asserts, the primary issue at trial was the identity of the shooter in the RAV4. Evid.R. 402 states that "[a]ll relevant evidence is admissible" and that "[e]vidence which is not relevant is not admissible." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. "There can be no question that evidence of motive in murder cases is always relevant and material." *State v. Lancaster*, 167 Ohio St. 391, 397 (1958). "[T]he failure to object to admissible evidence does not establish ineffective assistance of counsel." *State v. Carson,* 2012-Ohio-4501, ¶ 28 (10th Dist.), citing *State v. Tyler,* 2006-Ohio-6896, ¶ 40 (10th Dist.).

**{¶ 49}** The video suggested that based on the dispute from just two months before H.W.'s death, Moreland had a retaliatory motive against Byrdsong, whom he had seen in a white Impala. This was the same kind of vehicle that Byrdsong was driving when H.W. was shot, satisfying the criteria of relevance. Moreland fails to demonstrate prejudice by showing a reasonable probability that, but for the alleged error, the trial result would have been different given the overwhelming evidence of his guilt. This portion of Moreland's second assignment of error is overruled.

Failure to Object to Evidence of Prior Shooting

**{¶ 50}** Fifthly, Moreland asserts that trial counsel was ineffective for failing to object to evidence of a shooting in 2021. Deputy Sherri Jackson of the Montgomery County Sheriff's Office testified that she was previously employed at the Trotwood Police Department. She stated that while so employed on February 7, 2021, there were multiple

21

reports of shots fired from a bluish-gray Toyota RAV4 in Trotwood near a Golden Corral, "with multiple people hanging out the window, shooting at another vehicle." She testified that Moreland reported to police that he, his girlfriend, and their four children were the targets of the shooting. Police later located the vehicle, occupied by Red and Keonte Brown, who was also known as "Tutu," but Moreland "never cooperated further with any charges." Moreland argues that Brown was never involved in this case, and "counsel should have objected to the description of the incident as involving firearms, as it [was] unduly prejudicial to Moreland" by suggesting he previously had been involved in gang violence.

{¶ 51} As the State asserts, Fannon testified that Moreland told him that he had "a beef with a guy named Tutu." Fannon stated he was acquainted with Tutu, having previously served time in prison with him, and Moreland told him that Tutu had shot at him and his daughter when they were leaving the Golden Corral. The evidence established an ongoing feud between Moreland and Red, and Moreland associated Red with the white Impala, supporting a motive. There was no evidence that Moreland used a weapon while being shot at near the Golden Corral. In other words, he was a victim of the incident, belying his assertion that he was prejudiced by the fact that firearms were involved. Even if we assume that counsel's failure to object to testimony regarding Brown's involvement fell below an objective standard of reasonableness, prejudice is not demonstrated given the overwhelming evidence of Moreland's guilt in shooting H.W. The fifth portion of the assignment of error is overruled.

Failure to Raise a *Batson* Challenge

{¶ 52} Finally, in the sixth portion of his second assignment of error, Moreland argues that defense counsel was ineffective for failing to raise a *Batson* objection when the State exercised its first peremptory challenge on Juror 2, an African American female. Moreland

22

notes that the State's remaining three challenges were to female jurors, and while he concedes that it "is difficult to show prejudice on [a] record where no *Batson* challenge is made," he claims that "the State's pattern of striking female jurors and using its first peremptory challenge on the only individual identified as African American on the record" demanded a *Batson* challenge on the basis of race and gender. The State responds that Moreland cannot show that he was prejudiced by defense counsel's failure to object because the record is underdeveloped.

{¶ 53} In *Batson v. Kentucky*, 476 U.S. 79 (1986), "the United States Supreme Court held that the Equal Protection Clause forbids the State from exercising a peremptory challenge to excuse a juror solely because of that juror's race." *State v. Lewis*, 2011-Ohio-1411, ¶ 75 (2d Dist.), citing *State v. Murphy,* 2001-Ohio-112 (applying *Batson)*. The Court extended the prohibition against race-based peremptory challenges in *Batson* to prevent peremptory strikes based on gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).

{¶ 54} "The Supreme Court has set forth a three-step inquiry when the State's peremptory challenge has been challenged under *Batson.*" *Lewis* at ¶ 76. "First, the defendant must set forth a prima facie case of discrimination." *Id.* To do so, "'the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race.'" *Id.*, quoting *State v. Carver,* 2008-Ohio-4631, ¶ 48 (2d Dist.), citing *Batson,* 476 U.S. at 95. "If that occurs, the prosecutor must state a race-neutral explanation for striking the juror in question." *Id.* If the prosecutor does so, "the trial court must determine whether the defendant met his burden of proving intentional discrimination or whether the prosecutor's explanation was a pretext." *Id.* "'We do not presume prejudice from a trial counsel's failure to raise a *Batson* challenge, and . . . without an adequate record,

we cannot properly consider on direct appeal a claim of ineffective assistance of counsel for a trial counsel's failure to raise a *Batson* objection.'" *Id.* at ¶ 143, quoting *State v. Burks,* 2008-Ohio-2463, ¶ 57 (10th Dist.).

{¶ 55} Here, at sidebar during voir dire, the court brought to the parties' attention that he had been watching Juror No. 2 for "quite a while" and that she had been sleeping, with her head "falling completely down." The prosecutor acknowledged her awareness of the issue. Defense counsel stated, "[E]ither counsel or the Court needs to question her, make sure it's nothing physical or just because it is very obvious." The court asked Juror No. 2 to approach and indicated that she appeared to be sleeping. She stated that she was not used to being up so early and acknowledged that she slept "[j]ust a little." But she also said that she did not miss any questions and "should be fine." Voir dire continued. Subsequently, the State challenged Juror No. 2 for cause, asserting that "even after we called her up to the sidebar, she continued to struggle with staying awake." Defense counsel objected, stating, "I'm not sure that rises to the level of cause." The court overruled the challenge for cause based upon Juror No. 2's representation she could remain alert.

{¶ 56} The State exercised its first peremptory challenge to Juror No. 2. It then challenged female Juror No. 5, who was replaced with a female juror. The State exercised its third peremptory challenge to Juror No. 5's replacement, who was replaced by another female juror. Finally, the State exercised its fourth peremptory challenge to female Juror No. 7, who was also replaced by a female juror. The final twelve jurors consisted of ten women and two men.

{¶ 57} The record supports a conclusion that the State's initial peremptory challenge had a race and gender-neutral basis—Juror No. 2's struggle to stay awake. Defense counsel expressly shared the concerns of the State and the court, which could explain his failure to

24

raise a *Batson* challenge after the State exercised a peremptory challenge. As the State asserts, however, in the absence of any objections, the State was not required to articulate a race or gender-neutral explanation for its peremptory challenges, and we cannot definitively determine whether such a basis existed. *See Lewis*, 2011-Ohio-1411, at ¶ 143 (2d Dist.) (in the absence of a *Batson* objection and an explanation, "from this record, we cannot determine whether the State had race-neutral explanations for the peremptory challenge and, if so, whether the trial court could have properly accepted such explanations as credible and not a pretext for racial discrimination."). Since Moreland has failed to establish any race- or gender-based prejudice, ineffective assistance of counsel is not demonstrated. This portion of Moreland's second assignment of error is overruled. Having overruled all Moreland's arguments under his second assignment of error, the entirety of the assignment of error is overruled.

### III. Granting the Motion for Joinder

{¶ 58} In his third assignment of error, Moreland argues that the trial court erred when it granted the State's motion for joinder of his failure to comply and murder cases. This is so, he claims, because the State "improperly used a failure to comply . . . seven hours after the shooting to show consciousness of guilt." Moreland directs our attention to the rebuttal closing argument of the State in which the prosecutor suggested that Moreland "knew darn well why [law enforcement was] looking for him. Which is why he runs red lights." According to Moreland, there was "a strong risk that the evidence of the failure to comply *alone* could be used to show Moreland was guilty of the felonious assault and murder." The State responds that evidence of the failure to comply offense "would be admissible at a separate trial for H.W.'s murder, and the evidence pertaining to each offense was simple and direct."

{¶ 59} "The law favors joinder to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to conserve judicial resources, and to diminish the inconvenience to witnesses." *State v. Broadnax*, 2007-Ohio-6584, ¶ 33 (2d Dist.). "Even if offenses are properly joined pursuant to Crim.R. 8(A), a defendant may move to sever the charges pursuant to Crim.R. 14." *Id.* at ¶ 37. Crim.R. 14 requires the trial court to order separate trials "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses."

{¶ 60} "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159 (1988). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.*, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir. 1964).

{¶ 61} "[E]vidence is 'simple and direct,' where (1) proof of each offense is 'separate and distinct' or could be 'readily separated'; (2) the jury is unlikely to be confused; and (3) 'the evidence of each crime is uncomplicated.'" *State v. Kocevar,* 2023-Ohio-1513, ¶ 22

26

(2d Dist.). "Furthermore, the simple and direct test 'focuses on whether the trier of fact is likely to consider "evidence of one [offense] as corroborative of the other . . . ""'" *Id.* at ¶ 23, quoting *State v. Wiles*, 59 Ohio St.3d 71, 77 (1991), quoting *Dunaway v. United States*, 205 F.2d 23, 27 (D.C.Cir. 1953). "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, . . . but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense . . . ." *Torres* at 343-344; *see also State v. Clinton*, 2017-Ohio-9423, ¶ 52 (a "jury is capable of segregating the proof of multiple charges when . . . the evidence of each crime is uncomplicated.") "Key issues in determining if joinder is improper are the complexity of the evidence and whether the jurors are able to separate the proof required for the different offenses instead of combining the evidence and convicting upon all offenses." *State v. Shockey*, 1999 WL 961368 (2d Dist. June 25, 1999).

**{¶ 62}** In *State v. Hill*, 2002-Ohio-4585, ¶ 8 (8th Dist.), although the defendant opposed the State's motion for joinder, the court found that the defendant's failure to renew his opposition at the close of the evidence "constitutes a waiver of any previous objection to the joinder of these offenses for trial." Here, it is not clear from the record whether defense counsel renewed his opposition to joinder. After defense counsel moved for a judgment of acquittal, which the court denied, he was asked by the court if he had any other motions, and the transcript reflects the following response: "(Indiscernible) to our resting, and we would renew it when we rest." The court responded, "And the record would be clear that I would allow you to do that. . . . I'm ordering that you have done it."

**{¶ 63}** Even if defense counsel renewed his objection, the record does not support a conclusion that Moreland was prejudiced. As the trial court noted in its judgment entry sustaining the motion for joinder, the evidence and witnesses in each case overlapped

27

significantly such that joinder served judicial economy. The same vehicle was used in the same day in both offenses, and as the State asserts, "the tracking of Moreland and the vehicle by way of cell phone records, GPS data, and Flock cameras would be admissible at separate trials in both cases" if the counts were severed. That evidence tied Moreland to the RAV4, and for each offense, the RAV4's location and the identity of the driver or occupant were relevant. The evidence in each case was not complex, the timeline of events leading up to each indictment was easily understandable, and reasonable jurors could separate the proof required for the offenses in each case. In the absence of prejudice, Moreland's third assignment of error is overruled.

## Conclusion

**{¶ 64}** Moreland's Sixth Amendment right to counsel was not violated, he has not demonstrated ineffective assistance of counsel, and the trial court did not err in refusing to allow a separate trial on Moreland's failure to comply offense. Having overruled Moreland's assignments of error, the judgments of the trial court are affirmed.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.

28